IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ARCH SPECIALTY INSURANCE      )
COMPANY,                      )
                              )
            Plaintiff,        )
                              )
        v.                    )      1:13cv621
                              )
TRAVIS HEDRICK and TALLEY     )
RESTAURANTS, INC., d/b/a      )
INFERNO,                      )
                              )
            Defendants.       )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This is a declaratory judgment action by insurer Arch Specialty Insurance Company ("Arch") against its insured, Talley Restaurants, Inc., d/b/a Inferno, and Travis Hedrick, Inferno's patron. Several motions are before the court, but the principal questions arise from the cross-motions for summary judgment by Arch and Hedrick. (Docs. 23, 33.) The heart of the disagreement is whether Hedrick's injuries and damages stemming from his physical expulsion from Inferno by its security employees fall within the applicable limits of the assault and battery endorsement to the club's insurance policy with Arch. For the reasons set forth below, the court finds that they do. Consequently, Arch's motion for summary judgment will be granted, Hedrick's motion will be denied, and the remaining motions will be denied as moot.

# I. BACKGROUND

The undisputed facts are as follows:

## A. The Incident

Around midnight on April 22, 2009, Hedrick and his companion, Phillip Westmoreland, were patrons of Inferno, a nightclub in Greensboro, North Carolina. (Doc. 1-8, "Underlying Judgment," at 2.)[1] Inferno at that time was owned and operated by Defendant Talley Restaurants, Inc. (Id.) Westmoreland got involved in a "fist fight," and he and Hedrick were ejected from the club by Inferno employees. (Id.) While ejecting Hedrick, one employee put him in a headlock and eventually dropped him to the cement floor, which Hedrick's head hit. (Id.) Inferno staff then dragged Hedrick out of the nightclub and apparently left him outside, where he was found by a passerby who called for emergency aid. (Id.) The actions of the Inferno employees caused Hedrick

> life-threatening injuries, including a major concussion, bleeding of the brain resulting in head surgery (twice), being in an extended coma, large medical bills, pain and suffering, loss of income, and permanent injury including having seizures to which he is subject to for life as well as speech problems, loss of motor mechanical ability, numbness on the surface of the skin, and permanent scarring together with other major permanent medical complications.

---

[1] Both parties have authenticated and tendered the Underlying Judgment from the State court as an exhibit in their pleadings, and the parties have relied upon its findings of fact in their briefs to this court. No party disputes the accuracy of the State court's findings of fact; their disagreement is over whether additional facts alleged in the State-court complaint ought to be considered. (See Doc. 1-8; Answer ¶ 11; Doc. 6-1; Doc. 24 at 2 & n.3; Doc. 34 at 1.)

(Id. at 3.)

**B.    The Insurance Policy**

Prior to this incident, Inferno had purchased a commercial general liability insurance policy from Arch. (Doc. 1-1 ("Ins. Policy").) In the policy, Arch promised to defend Inferno against and indemnify it for lawsuits seeking damages for bodily injury:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

(Id. at 6.) "Bodily injury" must be "caused by an 'occurrence' that takes place in the 'coverage territory.'" (Id.) An "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 19.) The general policy coverage provides up to $1 million per occurrence and up to $2 million aggregate coverage for claims falling within these coverage provisions. (Id. at 4.)

These duties to defend and indemnify are subject to the following limitations:

> (1)  The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and
>
> (2)  Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of

judgment or settlements under Coverages A or B or medical expenses under Coverage C.

(Id.) Further, an endorsement (00ML0207001103) provided that payments made for attorneys' fees in defense of claims and settlements will reduce the applicable limits of insurance. (Id. at 34.) This endorsement rendered the insurance policy one commonly referred to as an "eroding limits" or "self-consuming" policy. See generally James M. Fischer, Insurer or Policyholder Control of the Defense and the Duty to Fund Settlements, 2 Nev. L.J. 1, 7 n.15 (2002).

As part of the policy, Arch and Inferno also agreed to an assault and battery coverage endorsement, which limits the amount that Arch could be required to pay under the policy for damages "arising out of or resulting from" an assault or battery:

A.   The following provision is added to SECTION III – LIMITS OF INSURANCE of both the LIQUOR LIABILITY and the COMMERCIAL GENERAL LIABILITY COVERAGE FORMS:

The Assault and Battery Aggregate Limit is the most we will pay for all:

1.   "injury" arising out of "assault and/or battery" as the result of the selling, servicing or furnishing of alcoholic beverages; and/or

2.   damages because of "bodily injury" or "property damage" and medical expenses attendant thereto, arising out of "assault and/or battery" as the result of all "occurrences"; and/or

4

3. damages because of all "personal injury" arising out of "assault and/or battery" sustained during the policy period.

(Ins. Policy at 31.) The endorsement set the "Assault and Battery Aggregate Limit" at $100,000 for such damages sustained during the policy period. (Id.) Under the endorsement, the term "assault and/or battery" means:

1. actual or threatened assault or battery whether caused by or at the instigation or direction of any insured, his "employees", patrons or any other person;

2. the failure of any insured or anyone else for whom any insured is legally responsible to prevent or suppress assault or battery;

3. the negligent:

   a. employment;
   b. investigation;
   c. supervision;
   d. training; or
   e. retention

of a person for whom any insured is or ever was legally responsible and whose conduct is described by 1. or 2. above.

(Id. at 32.)

Finally, the insurance policy creates a right for an injured person to sue Arch on a final judgment entered against Inferno:

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance.

(Id. at 16.)

5

## C. The State Court Proceedings

On May 4, 2009, Arch reserved all rights under the policy, pending further investigation, noting that it appeared that Hedrick had been "assaulted" at the nightclub and that such claims are subject to the $100,000 endorsement limit. (Doc. 1-3 at 1-2.) Nearly three years later, on March 15, 2012, Hedrick filed a complaint in Superior Court, Guilford County. ("Underlying Complaint," Doc. 24-5.) The complaint named several Defendants: Talley Restaurants, d/b/a Inferno; Paul and Dale Talley (the owners of Inferno); TR Nightlife, LLC (Inferno's successor in interest); and six John Does, the Inferno employees who allegedly beat Hedrick and expelled him from the nightclub. The complaint brought claims for negligence; negligent hiring, retention, and supervision; and punitive damages. In the course of the State-court proceedings, Hedrick voluntarily dismissed his claims against TR Nightlife and the Talleys. (Compl. ¶¶ 14, 16; Answer ¶¶ 14, 16.) The factual allegations of the complaint are considered in detail below.

Arch initially defended Inferno and the Talleys under the policy. (Compl. ¶ 12; Answer ¶ 12; Doc. 28-3.) On April 20, 2012, Arch sent a letter to Inferno, explaining that its duty to defend against and indemnify for Hedrick's claim was limited to the terms of the assault and battery endorsement and that, because of the settlement of a different claim against Inferno, only $5,000 remained for the defense against and indemnification of Hedrick's

claims. (Doc. 28-3 at 12.) On February 7, 2013, Arch sent Inferno another letter, explaining that only $255.95 remained available, and that when the amount was exhausted, Arch would cease its defense. (Doc. 1-7 at 2.) On March 7, 2013, within days of trial, Arch withdrew from the representation of Inferno, with Inferno's consent and with a note that Inferno could no longer afford representation on Hedrick's claims and would no longer defend against them. (Doc. 28-5.)

The case was called for trial a few days later, on March 11, 2013. No one appeared on behalf of Inferno. (Underlying Judgment at 1.) Because of this, the court sanctioned Inferno by striking its answer and "deeming admitted all allegations in" the Underlying Complaint. (Id.) Hedrick presented evidence against Inferno at the trial. (Id.) Judgment was entered against Inferno on March 14, 2013, for costs as well as compensatory damages in the amount of $2,750,000.00, with an annual interest rate of 8% continuing from March 15, 2012, and punitive damages in the amount of $500,000.00 for Inferno's gross negligence. (Id. at 4.)

### D. Proceedings in This Court

With the Underlying Judgment in hand, Hedrick, by counsel, sent a letter to Arch, demanding immediate payment. (Compl. ¶¶ 19, 24; Answer ¶¶ 19, 24; Doc. 1-9.) In response, Arch filed the present action for declaratory judgment against Hedrick and Inferno. In count one, Arch seeks a declaration that the aggregate

limit of assault and battery claims is $100,000; that Hedrick's injuries arose out of an assault or battery, as defined by the policy; that his claim is subject to the $100,000 limit of the policy; that the $100,000 limit was exhausted prior to the Underlying Judgment; and that, therefore, Arch has no duty to pay any part of it. (Compl. ¶¶ 29-32.) In count two, Arch seeks a declaration that the insurance policy does not cover punitive damages and thus Arch is not responsible for the punitive damages awarded in the Underlying Judgment. (Id. ¶¶ 33-35.)

Hedrick answered the complaint, admitting some factual matters, but denying both counts. Additionally, Hedrick brought four counterclaims against Arch. First, he seeks a determination "whether or not" Arch has a duty to pay the Underlying Judgment entered against Inferno. (Countercl. ¶ 18.) Second, he claims breach of contract for $3.25 million against Arch as a third-party beneficiary of the insurance policy. (Id. ¶¶ 19-22.) Third, he claims unfair and deceptive trade practices, as defined at N.C. Gen. Stat. § 58-63-15(11), entitling him to treble damages and attorneys' fees under N.C. Gen. Stat. § 75-1.1. Fourth, he seeks compensatory and punitive damages, as well as attorneys' fees and costs, for bad faith breach of contract. (Countercl. ¶¶ 31-36.) Although Inferno waived service of the complaint (Doc. 3), at no point has it appeared in this case — a fact that neither Hedrick nor Arch raises as an issue.

The following motions are currently before the court for decision: Both Arch (Doc. 23) and Hedrick (Doc. 33) move for summary judgment on all claims and counterclaims in this case. Arch also moves to stay all proceedings pending disposition of its motion for summary judgment. (Doc. 25.) Hedrick has not responded. Arch also moves to bifurcate the issues of compensatory damages from punitive damages in any future trial in the case. (Doc. 21.) Hedrick has not responded to this motion, either. Because this case involves a live and actual controversy under 28 U.S.C. § 2201(a), these motions are ripe for disposition.

## II. ANALYSIS

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine dispute of material fact remains. Where the non-moving party has the burden of proof, the moving party is entitled to summary judgment if it shows the absence of material disputed facts. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 325 (1986). For the purposes of these motions, the court regards statements of the non-moving party as true and draws all inferences in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But a non-moving party must establish more than

the "mere existence of a scintilla of evidence" to support his position.  Id. at 252.  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50.  Ultimately, summary judgment is appropriate where the non-movant fails to offer "evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.

Both parties seek summary judgment in this case.  When a court faces cross-motions for summary judgment, it must "review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'"  Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

In its briefing, Hedrick concedes count two of Arch's complaint — that Arch has no duty to pay punitive damages.  (Doc. 28 at 10 n.2.)  Hedrick also does not appear to dispute that Inferno's assault and battery coverage was exhausted prior to entry of the Underlying Judgment; certainly, Hedrick offers no evidence to contradict Arch's.  The overriding issue in this case, therefore, is whether Hedrick's personal injuries arose out of an assault or battery within the scope of the aggregate limits of the assault and battery endorsement, which has been exhausted, or rather are covered more broadly as an "occurrence" under the policy, for which additional coverage exists.

**B. Did Hedrick's Personal Injuries Arise out of an Assault or Battery?**

Insisting that this court is limited to considering the findings in the Underlying *Judgment*, which held Inferno liable for negligence and gross negligence, Hedrick argues that only negligently-inflicted personal injury occurred and that Arch's general personal injury coverage has not been exhausted. (Id. at 15.) Hedrick argues that Arch cannot now contest the terms of the Underlying Judgment because Arch withdrew its defense of Inferno before trial. In contrast, Arch asks the court to declare that Hedrick's injuries arose out of an assault or battery and argues that the court should make this determination based on the allegations of the Underlying *Complaint*.[2]

In general, a commercial general liability insurance policy creates two duties for the insurer: the duty to defend the insured against claims, and the duty to indemnify for claims that succeed. 14 Steven Plitt et al., Couch on Insurance § 200:3 (3d ed.). In North Carolina, as elsewhere, the Supreme Court has explained:

> Generally speaking, the insurer's duty to defend the insured is broader than its obligation to pay damages incurred by events covered by a particular policy. An insurer's duty to defend is ordinarily measured by the facts as alleged in the pleadings; its duty to pay is measured by the facts ultimately determined at trial.

[2] Hedrick had earlier moved to strike portions of Arch's complaint in this case that quotes the Underlying Complaint, as well as a copy of the Underlying Complaint attached to Arch's complaint in this case, all under the theory that the Underlying Judgment (and not the Underlying Complaint) controlled. (Doc. 4.) The Magistrate Judge denied the motion, finding the Underlying Complaint to be relevant. (Doc. 20.)

Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 340 S.E.2d 374, 377 (N.C. 1986) (emphasis added).

In a typical case of this sort, the injured bar patron sues the insured for damages, and the insurer files a separate action seeking a judicial declaration of whether it has a duty to defend the insured at all; usually, the insurer argues that the personal injury arose out of an assault or battery for which the insurance policy provides little or no coverage. E.g., Great Divide Ins. Co. v. Midnight Rodeo, Inc., No. 5:08-CV-204-F, 2010 WL 2077162 (E.D.N.C. May 24, 2010). In such a case, the second court will look to the allegations of the personal-injury complaint to determine whether a duty to defend has arisen. See, e.g., id. at *5; see also Waste Mgmt., 340 S.E.2d at 377 ("An insurer's duty to defend is ordinarily measured by the facts as alleged in the pleadings . . . ."). But when the personal-injury complaint indicates "that the event in question is not covered, and the insurer has no knowledge that the facts are otherwise, then it is not bound to defend." Waste Mgmt., 340 S.E.2d at 377.

In this case, Hedrick is not an insured seeking to have his insurer defend him against pending claims, which would ordinarily call for examination of the Underlying Complaint. Rather, he is a third-party beneficiary seeking recovery from Arch on a successful judgment already entered against the insured. To be

12

sure, the insurance policy itself conveys upon Hedrick a right to sue Arch on this "final judgment" against Inferno. (See Ins. Policy at 16.) The most efficient starting place for analysis, therefore, is the Underlying Judgment upon which Hedrick predicates his claims. For, if the Underlying Judgment fails to provide a basis for recovery, any failure of the Underlying Complaint to do so will not matter.

No matter which State-court document is examined, two principles apply equally. First, the assault and battery endorsement's "arising out of" language requires only proximate causation. Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC, 692 S.E.2d 605, 613 (N.C. 2010). Second, although the insurance policy here does not define the terms "assault" or "battery," the terms are not foreign to courts, nor are they ambiguous. See United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993) (rejecting argument of ambiguity and stating that "the common meanings of 'assault' and 'battery' subsume all forms of tortious menacing and unwanted touching"); Trainwreck West, Inc. v. Burlington Ins. Co., 235 S.W.3d 33, 40-41 (Mo. Ct. App. 2007) (rejecting claim that terms "assault" and "battery" were ambiguous where not defined in the CGL policy). A battery[3] occurs under North Carolina law "when the

---

[3] Because, as shown infra, the facts in this case clearly show a battery, whether an assault also occurred need not be considered.

plaintiff is offensively touched against [his] will." Lynn v. Burnette, 531 S.E.2d 275, 279 (N.C. Ct. App. 2000) (citation omitted). The intent required for battery is the tortfeasor's "intent to cause a harmful or offensive contact," Andrews v. Peters, 330 S.E.2d 638, 641 (N.C. Ct. App. 1985), aff'd, 347 S.E.2d 409 (N.C. 1986), and the wrongdoer need not act with malice, willfulness, or wantonness, Myrick v. Cooley, 371 S.E.2d 492, 496 (N.C. Ct. App. 1988). Under North Carolina law, grossly or culpably negligent conduct will satisfy the intent requirement. See Pleasant v. Johnson, 325 S.E.2d 244, 248 (N.C. 1985) ("Constructive intent to injure exists where conduct threatens the safety of others and is so reckless or manifestly indifferent to the consequences that a finding of willfulness and wantonness equivalent in spirit to actual intent is justified."); Lynn, 531 S.E.2d at 279 (noting that "the intent required for battery may be supplied by grossly or culpably negligent conduct"). Consequently, "[t]he issue in an action for battery is not the hostile intent of the defendant, but rather the absence of consent to contact on the part of the plaintiff." Lynn, 531 S.E.2d at 279 (citing McCracken v. Sloan, 252 S.E.2d 250, 252 (N.C. Ct. App. 1972)).

Therefore, if Hedrick's injuries were proximately caused by someone intending to cause harmful or offensive contact with him without his consent, they are compensable, if at all, only under

14

the limits of the assault and battery endorsement that the parties agree have been exhausted.

### 1. The Underlying Judgment: Whether Hedrick's Injuries Arose out of a Battery

According to the findings of fact in the Underlying Judgment, Hedrick's friend got involved in a "fist fight and was ejected" by Inferno employees. (Underlying Judgment at 2, ¶ 2.) The security guards "then moved to eject" Hedrick. (Id.) This intent to eject Hedrick explains the means of ejectment that followed, which turned physical and offensive.

In effecting the ejectment, one guard "grabbed [Hedrick] in a headlock and in the course of controlling him, negligently dropped [Hedrick] on the cement floor causing [Hedrick's] head to hit the cement floor." (Id.) The State court's finding that Hedrick was "negligently grabbed" and "negligently dropped," however, does not vitiate the intent for the headlock. "Grabbing" and putting someone in a "headlock" implies intentionality on the part of the actor — and nothing in the Underlying Judgment suggests otherwise. As another court noted in a similar situation, "[i]t is hornbook law . . . that the intent which is an essential element of the action for battery is the intent to make contact, not to do injury." United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 354 (2d Cir. 1993) (rejecting negligence claims where nightclub bouncer "grabbed" patron around the "arms and neck" and "started

to strike [him] in the face"); accord Andrews, 330 S.E.2d at 640–41.

After the battery-by-headlock, the State court found that the security guards "negligently carried [Hedrick] out and put him, insensible, out of the Club where he was found by emergency personnel after a call from a passerby." (Underlying Judgment at 2, ¶ 3.) The court explained that this finding was intended to show that the "handling" of Hedrick was "negligent in that even if [the guards] had a right to eject [Hedrick], they handled him in a negligent and careless manner which led directly to his head striking the cement." (Id. at 2, ¶ 4.) This finding does not indicate that the guards carried Hedrick accidentally or were otherwise unaware that they were carrying him out of the nightclub. Rather, under any plain reading of the Underlying Judgment, Hedrick's injuries arose from a battery committed by one or more of Inferno's bouncers.

Hedrick argues that the negligence findings of the Underlying Judgment overcome the limitations of the assault and battery endorsement. This argument, which has been commonly raised in numerous courts in similar or closely-related contexts and rejected, is unpersuasive. See, e.g., Great Divide Ins., 2010 WL 2077162, at *6 (granting judgment on the pleadings for insurer under North Carolina law, noting "where the face of the Underlying Action describes a 'physical assault' at the hands of agents or

16

employees of the bar, the insurer incurs no duty to defend because the suit arises ultimately from that assault and battery" even though the complaint sounds in negligence); Century Surety Co. v. Seductions, LLC, 349 F. App'x 455, 458-59 (11th Cir. 2009) (finding that "artful pleading of claims sounding in negligence does not change the fact that [claimant's] injuries arose directly from an allegedly intentional attack" and declaring that patron's injuries arising from an assault and battery limited insurer's liability to $25,000 assault and battery endorsement in CGL policy despite allegations that patron's injuries and damages were caused by nightclub's negligence); Trainwreck West, 235 S.W.3d at 44 (finding that "where a plaintiff's negligence claim arises out of an assault or battery, the assault or battery exclusion bars coverage of the insured's negligence claim") (citing multiple cases); Tunnel, 988 F.2d at 354 (rejecting artful pleading of negligence claims that arose from bouncer's battery of patron as basis for avoiding policy exclusion for assault and battery); St. Paul Surplus Lines Ins. Co. v. 1401 Dixon's, Inc., 582 F. Supp. 865, 867 (E.D. Pa. 1984) ("Although the complaint charges [insured] with negligence, [claimant's] injuries were directly caused by an assault and battery — he was struck from behind. The mere fact that [insured] may have been negligent in allowing the assault and battery to occur does not avoid the effect of the exclusion.").

Thus, the facts found by the State court in the Underlying

Judgment establish that a battery occurred, the findings of negligence notwithstanding.[4]

### 2. Does Hedrick's Judicial Estoppel Argument Save His Claim?

Hedrick seeks to avoid the policy limits by invoking the

---

[4] Because the Underlying Judgment facially falls within the assault and battery endorsement, which limits Inferno's insurance coverage, the court could stop here and certainly need not reach Arch's separate argument that exhaustion of the limited assault and battery coverage prior to entry of the Underlying Judgment relieved the insurer of any obligation to defend Inferno and, consequently, from any duty to indemnify. However, in further support of the court's conclusion, it is noteworthy that Hedrick overlooks the fact that the Underlying Judgment "deem[ed] admitted the allegations of the [Underlying] Complaint" as a result of Inferno's failure to appear at trial. (Underlying Judgment at 1.) The Underlying Complaint shows that Inferno's security staff intended to "eject" Hedrick and effected this intent through offensive and unconsented physical touching. (Underlying Compl. ¶ 9.) John Doe One "put [Hedrick] in a headlock and attempted to move him up and out." (Id.) Another security officer, John Doe Two, then "grabbed" Hedrick while he was "continuing to struggle." (Id.) During the struggle, another security officer, John Doe Three, "hit [Hedrick] over the head with a partially filled liquor bottle," which did not break but "did split the skin and did remove some of [Hedrick's] hair." (Id.) This strike left Hedrick "somewhat insensible," putting him under the headlocking guard's "complete control." (Id.) That guard then carried Hedrick "several paces and threw [Hedrick] down on the cement floor where his head made an audible crack even in the noisy Club. [Hedrick] was at that point plainly knocked out." (Id.) Once knocked out, other security guards "grabbed" Hedrick's legs and dragged him across the floor and up a stairway, which his head "hit" as he was carried. (Id. ¶ 10.) Rather than call for medical aid to attend to a patron "knocked out cold" with "blood . . . running from his ear," the guards "simply laid [Hedrick] down on the cement outside the bar where he would have surely died from his severe head injuries had a passer-byer [sic] not come upon him and insist that someone call for medical help." (Id. ¶ 11.) Hedrick characterized the security guards as "little more than untrained thugs" (id. ¶ 22) whose "brutal" and "violent acts" caused his injuries (id. ¶ 13.). Thus, although Hedrick's Underlying Complaint sought relief on theories of negligence, gross negligence, willfulness, and wantonness, its factual allegations — deemed admitted by the Underlying Judgment — also indisputably show that Hedrick's injuries arose out of or resulted from intentional, unconsented conduct causing harmful or offensive contact.

doctrine of judicial estoppel. Hedrick argues that, because Arch initially defended Inferno and filed an answer on its behalf *denying* the Underlying Complaint's allegations sufficient to show a battery (Doc. 28 at 11), Arch should now be judicially estopped from arguing otherwise.

Judicial estoppel requires proof of three elements: (1) the party to be estopped must now be attempting to adopt a position about a fact (as opposed to one of law) that is inconsistent with a stance taken in prior litigation; (2) the prior inconsistent position must have been accepted by the court; and (3) the party to be estopped must have intentionally misled the court to gain unfair advantage. <u>Zinkand v. Brown</u>, 478 F.3d 634, 638 (4th Cir. 2007) (citations omitted). Courts should only apply the doctrine "with caution." <u>John S. Clark Co. v. Faggert & Frieden, P.C.</u>, 65 F.3d 26, 29 (4th Cir. 1995) (citation omitted).

It is doubtful that judicial estoppel has any application in a context such as this, where Arch, in discharging its duty to defend Inferno, was at best only putting Hedrick to his proof in responding to the Underlying Complaint. But even if the doctrine could apply, Hedrick clearly cannot show that its second element is met. Arch's alleged position in its answer, that a battery did not occur, was <u>not</u> accepted by the State court. Rather, the State-court judge sanctioned Inferno for not appearing at trial by explicitly striking its answer and deeming all allegations of the

19

complaint __admitted__.  (Underlying Judgment at 1.)[5]  Thus, Hedrick's judicial estoppel argument fails.

## III. CONCLUSION

As to count one of Arch's complaint, there is no genuine dispute that Hedrick's claim, resting on the Underlying Judgment, arose out of a battery and was subject to the assault and battery endorsement's $100,000 limit.  Because the limit was exhausted prior to entry of the Underlying Judgment, Arch has no liability to Hedrick.  (__See__ Ins. Policy at 16 ("A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance.").)

As for count two of Arch's complaint, Hedrick concedes that it cannot recover against Arch for the punitive damages awarded against Inferno in the Underlying Judgment.

For these reasons, Hedrick's first counterclaim against Arch fails as a matter of law.  Because Arch did not breach the insurance

---

[5]  Indeed, if the doctrine had any application in this case, it might be against Hedrick.  Hedrick made allegations in his Underlying Complaint which were deemed admitted upon Inferno's failure to appear at trial. Based on these allegations and other evidence, Hedrick successfully urged the State court to award punitive damages against Inferno.  Yet, now Hedrick seeks to have this court conclude that the Underlying Judgment's specific factual findings of "negligence," which Hedrick likely urged in view of Arch's policy limits, should take precedence over his prior allegations of battery and other intentional misconduct.

policy, Hedrick's second, third, and fourth claims for relief also fail.

For all these reasons, therefore,

IT IS ORDERED that Arch's motion for summary judgment (Doc. 23) is GRANTED, Hedrick's motion for summary judgment (Doc. 33) is DENIED, and Arch's motions to stay (Doc. 25) and bifurcate (Doc. 21) are DENIED as moot.  This case is DISMISSED WITH PREJUDICE

         /s/   Thomas D. Schroeder
         United States District Judge

November 21, 2014